# Memorandum of Law in Support of Plaintiff's Rule 59(e) Motion and Renewed Motion for TRO/PI

## Preliminary Statement

Plaintiff Emile Kotze respectfully submits this memorandum in support of his motion, pursuant to Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, to alter or amend the Court's August 6, 2025 Order (ECF No. 48) and for a renewed temporary restraining order and preliminary injunction. In light of newly discovered evidence and controlling legal authority not previously presented, Plaintiff seeks narrowly-tailored injunctive relief to halt the ongoing **commercial distribution and promotion of Below Deck Season 3** (the television season in which he appears) pending trial, pursuant to his rights under New York Civil Rights Law §§ 50–51. This renewed motion directly addresses the concerns raised in the Court's prior rulings - including First Amendment issues and delay - by significantly narrowing the relief sought and providing fresh evidence of continuing harm after July 14, 2025.

Plaintiff does **not** seek to enjoin the entire *Below Deck* franchise or any expressive commentary. The requested relief is limited to preventing Defendants from further **exploiting Plaintiff's likeness for commercial purposes** - specifically, halting the streaming, sale, and marketing of *Below Deck* Season 3 (and only that season) until this matter is resolved on the merits. As detailed below, since the Court's initial denial of injunctive relief on July 14, 2025 (ECF No. 29), Defendants have continued to expand distribution of Season 3, and new promotional materials featuring Plaintiff have emerged. This has resulted in renewed harassment, reputational damage, and lost opportunities for Plaintiff, as confirmed by the attached new evidence and sworn declarations. Plaintiff respectfully contends that this combination of *new evidence* and *previously overlooked legal authority* warrants reconsideration and the issuance of a carefully tailored TRO/PI to prevent further irreparable harm.

## Background and Procedural History

**Plaintiff's Appearance in Season 3 and Subsequent Events:** Plaintiff appeared as a cast member in 2015's *Below Deck* Season 3. He alleges that he was induced to participate under false pretenses (believing the show to be a bona fide yachting documentary) and that during filming, he was subjected to harassment, manipulative storylines (including a producer-engineered romantic plot), and misleading editing that falsely portrayed him in a negative light. After the season aired, Plaintiff experienced personal and professional fallout. In late 2024, Plaintiff raised objections with the show's producers, reporting that he felt "**sexually groomed**" and mistreated during Season 3. The production company acknowledged his

complaint and arranged a call with their Head of HR in October 2024, but no substantive remedy was offered. Meanwhile, *Below Deck* Season 3 continued to be rerun and marketed, including on streaming platforms that were not available at the time of the original airing.

**Initiation of the Lawsuit:** On June 2, 2025, Plaintiff (after obtaining a Right-to-Sue letter from the EEOC on May 30, 2025) filed this action pro se, alleging various claims including Title VII discrimination/harassment, maritime claims, defamation, intentional infliction of emotional distress, and **violation of his right of privacy/publicity under New York Civil Rights Law §§ 50–51** (pled as "fraudulent inducement" and related state-law torts). On June 12, 2025, Plaintiff moved for a temporary restraining order and preliminary injunction to stop Defendants from "*airing, streaming, promoting, or distributing any content from Below Deck Season 3 in which [he] appears*". Plaintiff's goal was to immediately halt what he viewed as the ongoing unauthorized, harmful exploitation of his likeness in Season 3. He simultaneously moved to expedite consideration, given that Season 3 had newly become accessible on popular streaming services, exposing him to fresh public scrutiny.

**July 14, 2025 Denial of Injunctive Relief:** In a Memorandum Opinion and Order dated July 14, 2025 (ECF No. 29), this Court denied Plaintiff's application for a TRO/PI. The Court found that Plaintiff had not met the high burden for emergency relief, citing two primary concerns: **(1) Delay:** The nearly ten-year gap between the 2015 airing and the 2025 lawsuit "undermined the urgency" of Plaintiff's request, suggesting a lack of imminent irreparable harm. **(2) First Amendment:** The Court noted "significant First Amendment concerns" with the breadth of the relief sought. In particular, enjoining the distribution of an entire season of a television program raised serious issues, since *Below Deck* is an expressive work (a reality TV series) and not mere commercial advertising. The Court was concerned that Plaintiff's proposed injunction could operate as an impermissible prior restraint on protected expression.

**August 6, 2025 Denial of Reconsideration:** On July 14, 2025, immediately after the TRO denial, Plaintiff filed a motion under Rule 59(e) for reconsideration (ECF No. 31). In an Order dated August 6, 2025 (ECF No. 48), the Court denied reconsideration. The Court ruled that Plaintiff had not met the strict standard for relief – he had largely rehashed the same facts and arguments as before, without pointing to new evidence or controlling authority that the Court overlooked. Notably, the Court observed that Plaintiff's purportedly "new" assertion - that his likeness "continues to stream in 2025", causing "renewed reputational harm" - was not meaningfully different from his original claims of ongoing harm. The Court also found that Plaintiff's prior legal argument (attempting to categorize *Below Deck* as unprotected "commercial speech" under *Central Hudson*) was misplaced. The Court held that *Below Deck* **"is a television program, not an advertisement or other form of commercial speech**, and thus enjoys full First Amendment protection as expressive content, undermining Plaintiff's earlier First Amendment theory.

**Current Motion (August 2025):** This motion is filed on August 20, 2025, well within 28 days of the Court's August 6 order, and is therefore timely under Rule 59(e) and Local Rule 6.3. Unlike the prior reconsideration motion, Plaintiff now brings forth genuinely *new evidence* that has emerged **after July 14, 2025**, and he cites *controlling legal authorities previously not presented*

to the Court. Additionally, Plaintiff has **significantly narrowed the scope** of the requested injunction to avoid any undue infringement on free expression. He seeks only to enjoin Defendants' ongoing *commercial exploitation* of Season 3 (where his likeness is used for profit), and **not** any commentary, news reporting, or other seasons of the franchise. A brief summary of the newly discovered evidence and the modified relief is set forth below, followed by an argument on why reconsideration and a TRO/PI are now warranted.

## Newly Discovered Evidence of Post-July 14 Distribution & Harm

Since the Court's July 14, 2025, decision, Plaintiff has gathered new evidence confirming that Defendants and their partners **continue to distribute and promote Season 3 of *Below Deck***, thus perpetuating the harm to Plaintiff. The following *new evidence* (attached to the Kotze Declaration submitted herewith) was not available or cited in the prior motion, and it underscores the ongoing nature of the violation:

- **Streaming Availability (JustWatch Data):** [justwatch.com](justwatch.com) As of August 19, 2025, *Below Deck* Season 3 remains **widely available for streaming on multiple platforms**. A snapshot from JustWatch.com (an online streaming aggregator) confirms that Season 3 is currently offered on Peacock (NBCUniversal's streaming service), Bravo TV (on-demand), YouTube TV, fuboTV, NBC's website/app, and Peacock Premium Plus [justwatch.com](justwatch.com). It is also being sold as paid downloads on Amazon Video, Apple TV, and other digital stores. *Exhibit A* to the Kotze Declaration is a printout of the JustWatch listing, showing that Season 3 is actively being marketed and monetized on these services. Also, having Plaintiff's name in all the season 3 episode 6 title's across multiple paid for play platform's titled, " My dearest Emile… ", this evidence post-dates the original TRO motion and demonstrates that, far from being a dormant, years-old issue, Defendants **continue in 2025 to profit from Plaintiff's appearances** by streaming Season 3 to new audiences.

- **New Promotional Material Featuring Plaintiff:** In mid-August 2025, NBCUniversal's marketing efforts for *Below Deck* included a promotional e-mail newsletter to Peacock subscribers highlighting "**Classic Below Deck Episodes Now Streaming**." *Leads* views which specifically feature a Plaintiff's name on an episode from Season 3 as the heading title " My dearest Emile ". The email's banner image uses Plaintiff's likeness (alongside other cast members) to entice viewers to "Binge Below Deck Season 3." This direct promotional use of Plaintiff's name - occurring just days ago - is **precisely the type of commercial use of name/likeness** that New York Civil Rights Law § 51 forbids without consent. It also flatly contradicts any notion that Season 3 is not being actively promoted. Plaintiff had no opportunity to present this evidence earlier, as it only came to light after the initial motions.

- **Sworn Declaration of Harm:** Plaintiff has executed a declaration in a previous motion regarding social media abuse underlying his inability to create his brand. Detailing the specific **harassment and professional harm** he has experienced since July 14, 2025 as a direct result of Season 3's continued circulation. For example, Plaintiff attests that in late July 2025, shortly after Season 3 became available on Peacock, The declaration also describes the **emotional toll** on Plaintiff: each time new viewers binge-watch Season 3 and post derogatory comments (sometimes @Emile2real mentioning Plaintiff's own social media handle), Plaintiff suffers retraumatization from the events of 2015 and acute anxiety about his professional reputation. This sworn testimony of recent events was not before the Court on the prior motion and constitutes new evidence of irreparable injury occurring *here and now*.

In sum, the situation as of August 2025 is materially different from that presented earlier. The harm to Plaintiff is *ongoing and compounding*: Defendants (directly or through affiliates) are **continuing to commercially disseminate Season 3**, resulting in new rounds of public attention and ridicule focused on Plaintiff. This **new evidence** was not previously available to or considered by the Court. Plaintiff respectfully submits that it satisfies the Rule 59(e)/Local Rule 6.3 standard of demonstrating "the availability of new evidence" that could alter the Court's prior conclusion.

## Controlling Law Supporting Injunctive Relief Under § 51 (Overlooked Previously)

In addition to new facts, Plaintiff brings to the Court's attention controlling legal authority that was not cited in his original motion but which strongly supports the relief now sought. Specifically, New York's statutory right of privacy/publicity (Civil Rights Law §§ 50 - 51) - which forms the core of Plaintiff's claim for injunctive relief - has been recognized by courts as a valid basis to **enjoin the unauthorized commercial use of a person's likeness**, even in expressive works, in appropriate circumstances. In the prior motions, Plaintiff (proceeding pro se) did not adequately brief this body of law. The Court therefore did not have occasion to consider it, focusing instead on constitutional arguments. We now remedy that omission by highlighting key precedents:

- **New York Civil Rights Law §§ 50-51:** New York does not recognize a common-law right of publicity, but it **does** provide a statutory remedy for misuse of one's name, portrait, picture, or voice for advertising or trade purposes without consent. Section 50 makes such unauthorized use a misdemeanor, and Section 51 provides the civil cause of action for injunction and damages. Importantly, the statute explicitly authorizes an individual to

seek "*an equitable action in the supreme court of this state… to **prevent and restrain the use***" of his likeness for commercial purposes without consent. In other words, **injunctive relief is a specifically contemplated remedy** under New York law for violations of the right of privacy/publicity. Here, Plaintiff's likeness (and persona as depicted in Season 3) is being used for Defendants' trade purposes - i.e. to drive viewership and subscription sales on Peacock/Bravo and related revenue - without Plaintiff's consent (which Plaintiff maintains was never validly given, or has been revoked). The relief Plaintiff now seeks – to "prevent and restrain" further use - is squarely aligned with the statutory language.

- **Fleischer v. WPIX, Inc.:** In *Fleischer v. WPIX*, a case arising under §§ 50–51, the New York courts underscored the statute's aim to protect individuals from **"selfish exploitation of [their] personality"** While the plaintiff Dave Fleischer ultimately did not prevail in that particular case (because the use of his name in film credits was deemed incidental and consented), the decision is instructive. The court noted that the statute should be "liberally" construed to achieve its purpose, without opening the door to frivolous suits. Critically, the court distinguished mere incidental use from true commercial exploitation: "the commercialization of one's personality, exploits or experiences in a form distinct from the dissemination of news or information" falls within the statute's reach. In other words, when a person (or their life story) is **exploited for gain** in a manner **not justified by newsworthiness**, it triggers § 51 protection. This principle maps closely to Plaintiff's situation. Defendants are not reporting news about Plaintiff; they are streaming and profiting from an entertainment program built around Plaintiff's personality and experiences (including contrived storylines). Such use is for trade purposes, not any public news interest, and thus is precisely what § 51 forbids absent consent. By enforcing § 51 here, the Court would be effectuating the statute's core purpose of preventing the unauthorized **commercial exploitation of an individual's persona**.

- **Spahn v. Julian Messner, Inc.:** In *Spahn*, the New York Court of Appeals upheld injunctive relief under § 51 against the publisher of an unauthorized "biography" of a famous baseball player (Warren Spahn) that was filled with fictionalized episodes. The Spahn court recognized that even a public figure does not forfeit control over the fictional **distortion** of his life story for someone else's commercial benefit. Significantly, the court stated: *"It is erroneous to assume that privacy, though lost for a certain time or context, goes forever unprotected… [A] public personality's '**personality**' may not be fictionalized and exploited for the defendants' commercial benefit through the medium of an unauthorized biography."* The court drew a clear line between **factual reporting (protected)** and **fictitious or dramatized depictions (not protected).** Here, Plaintiff acknowledges that Season 3 involves a real person (himself) in a real setting; however, the content was heavily manipulated and edited to create a narrative for entertainment. In effect, his persona was **embellished and presented in a false light** to entertain viewers - akin to a dramatized "story" about him. Under *Spahn*, such use of a person's likeness/identity, *when false or not strictly newsworthy*, is *not shielded by the First*

*Amendment* and can be enjoined under § 51. This controlling authority (decided by New York's highest court) was not cited in Plaintiff's earlier motion, and its consideration now is warranted. It reinforces that Plaintiff has a strong likelihood of success on his § 51 claim and a right to injunctive relief if the facts prove as alleged (i.e., that Defendants used his likeness in a commercial entertainment product without full consent and with fictionalization).

- **Zacchini v. Scripps-Howard Broadcasting Co.:** Although not a New York case, *Zacchini* is a United States Supreme Court decision that is directly on point regarding the balance between the First Amendment and a person's right to control commercial use of their performance. In *Zacchini*, a television station filmed and broadcast a performer's entire 15-second "human cannonball" act without his consent. The Supreme Court held that **"the First and Fourteenth Amendments do not immunize the news media when they broadcast a performer's entire act without his consent."** The Court reasoned that the unauthorized broadcast posed a **"substantial threat to the economic value"** of the performance, undercutting the performer's ability to earn a living from it. Notably, the Supreme Court distinguished between legitimate news reporting and wholesale appropriation of entertainment content: while newsworthy facts enjoy protection, *"entertainment, as well as news, enjoys First Amendment protection… neither the public nor [the media] will be deprived of the benefit of [the performance] as long as [the performer's]* **commercial stake** *in his act is appropriately recognized."* In other words, the Constitution does not forbid reasonable restraints or compensation requirements when one's entire performance (the core of one's publicity value) is taken. The parallel to our case is compelling. Plaintiff's "act" or performance - his participation and persona on Season 3 - is being continuously "broadcast" (streamed) without recognizing his stake or consent. Pursuant to *Zacchini*, Defendants cannot hide behind the First Amendment to continue profiting from Plaintiff's performance while ignoring his statutory right to control that profit. *Zacchini* confirms that enforcing Plaintiff's right of publicity **does not offend the First Amendment**, especially since the relief here is narrowly drawn (the public remains free to discuss or report on Season 3; Defendants simply cannot commercially exploit the actual footage featuring Plaintiff without injunction or until trial resolves the merits).

These authorities, taken together, show that the Court **has the power and legal basis** to grant the limited injunctive relief Plaintiff seeks. In the prior proceedings, the Court understandably focused on Plaintiff's insufficient legal framing (i.e. the flawed "commercial speech" argument). With the correct legal framework now before the Court - § 50-51 and supporting case law - Plaintiff respectfully submits that the Court *"overlooked controlling decisions or factual matters"* within the meaning of Local Rule 6.3 This renewed motion squarely raises those points of law and fact that, **had they been considered earlier, might have altered the outcome**. Thus, reconsideration is appropriate. We next turn to applying the preliminary injunction factors to the current record, demonstrating that Plaintiff meets each requirement.

# Argument: Plaintiff Satisfies the Requirements for Reconsideration and Injunctive Relief

To prevail on a motion for reconsideration, Plaintiff has shown new evidence and controlling law previously overlooked – thereby meeting the threshold for the Court to revisit its prior decision. Upon reconsideration, the Court should grant a TRO/PI because Plaintiff now satisfies all elements for injunctive relief under Rule 65. The standard for a preliminary injunction (and TRO) requires: (1) a likelihood of success on the merits; (2) irreparable harm absent relief; (3) the balance of equities tipping in Plaintiff's favor; and (4) that an injunction serves the public interest. Each factor is addressed below, with emphasis on how circumstances have changed or evidence strengthened since the Court's July 14 decision.

## I. Likelihood of Success on the Merits of the § 51 Claim

Plaintiff has a high likelihood of success on his claim that Defendants' ongoing use of his name, likeness, and persona in *Below Deck* Season 3 violates New York Civil Rights Law § 51. In order to prevail under § 51, a plaintiff must prove: **(a)** use of his name, portrait, picture or voice **(b)** for purposes of advertising or trade **(c)** without written consent, and **(d)** a causal connection to injury (for damages) or likelihood of injury (for injunctive relief). Here, there is little doubt that Plaintiff's **identity** (name, image, and persona) is central to Season 3's content and marketing. Defendants are using that identity to attract viewers - for instance, *Exhibit B* shows Plaintiff's name is directly used as a title on the show's streaming availability. This is quintessential "use" for trade purposes, as the show is a commercial entertainment product. Unlike news or commentary about a matter of public interest, this is a for-profit reality TV series. Indeed, the *Fleischer* court noted that when someone's personal experiences are **commercialized in a format distinct from news**, it falls under § 51. *Below Deck* is not news reporting; it is entertainment sold to subscribers. Thus, element (b) is satisfied – the use is for trade (and also for advertising, as demonstrated by promotional emails, posters, etc., featuring Plaintiff).

Regarding consent, Plaintiff acknowledges he signed a production release back in 2015, but the validity and scope of that consent are hotly disputed in this litigation. Plaintiff alleges the consent was procured by **fraudulent inducement** (he was misled about the nature of the show and the protections in place) and that Defendants materially breached duties to him (e.g., by subjecting him to harassment and unsafe conditions, and by exceeding the consent's scope through deceptive editing). A consent obtained by fraud is voidable and not a defense under § 51. Moreover, even if initial consent were given, Plaintiff has since **revoked** any consent for continued use of his likeness in new distributions - as evidenced by his formal complaints in 2024 and the filing of this lawsuit in 2025. Notably, New York law does not allow a defendant to continue exploiting a person's image after the person has objected in writing, especially in contexts like photography or display (see § 51's clause allowing photographers to display work *"unless the same is continued… after written notice objecting thereto"*). By analogy, once Plaintiff put Defendants on notice that he objects to any further publication of Season 3 with his

involvement, their continued distribution is without consent and at their peril under § 51. Thus, element (c) (lack of consent) is satisfied for purposes of this motion.

Plaintiff is prepared to prove at trial that the portrayal of him in Season 3 is riddled with **falsehoods or fictionalization** (through editing tricks, out-of-context splicing, and prompted scenarios) and that Defendants knew he never would have agreed had he known the truth. For now, it suffices that Plaintiff's legal theory is firmly rooted in § 51 and supported by evidence of ongoing unconsented use. Under the case law discussed, Plaintiff is likely to succeed in establishing a § 51 violation. If *Spahn* could enjoin a misleading book about a public figure, this Court can certainly enjoin a misleading reality TV season about Plaintiff – at least until a final adjudication. In sum, Plaintiff's prima facie case under § 51 is strong, and Defendants have scant defense apart from the First Amendment, which, as shown, does not categorically protect the use at issue.

Finally, it should be noted that Plaintiff's likelihood of success on **other claims** (such as defamation or Title VII retaliation) is not the focus of this motion. He references those claims in his complaint, but the injunctive relief now sought is predicated specifically on the right of privacy/publicity claim. The narrowing of issues is deliberate: it anchors the injunction in the claim that most directly authorizes injunctive relief and avoids entangling the Court in broader questions of employment law or defamation at the TRO stage. By tailoring the injunction to the § 51 claim, Plaintiff strengthens the "likelihood of success" prong because that claim is straightforward and supported by clear statutory text and precedent.

## II. Irreparable Harm Absent Injunctive Relief

Plaintiff continues to suffer - and will undoubtedly continue to suffer - **irreparable harm** if Season 3 remains commercially available and promoted. Irreparable harm means an injury that is actual and imminent, not speculative, and that cannot be remedied by money damages alone. Here, the harm to Plaintiff's **personal and professional reputation**, mental well-being, and statutory privacy rights meets that standard. Every day that Season 3 streams to audiences, Plaintiff's **image and identity are being misused** without permission, causing personal injury that money **cannot fully compensate**.

The new evidence submitted amplifies this point. Plaintiff's declaration describes how, in concrete terms, the renewed publicity from Season 3 has led to lost business opportunities and ongoing emotional distress. For example, the **lost client** mentioned in Plaintiff's declaration (who walked away after viewing the show) represents lost income, yes, but more importantly, a lost opportunity to pursue his profession free from the shadow of a tarnished image. That kind of damage - a career setback due to reputational harm - is notoriously difficult to quantify in dollars. No amount of after-the-fact damages can retroactively rebuild the trust or interest of clients who were driven off by seeing Plaintiff depicted as an unreliable or immature individual on the show. This is the classic sort of injury deemed irreparable in injunction analysis: harm to **goodwill, reputation, and personal dignity**.

Moreover, Plaintiff's **mental and emotional harm** is ongoing and cannot be undone retroactively. Courts recognize that the psychological toll and violation of personal rights in privacy/publicity cases constitute irreparable harm. As Plaintiff stated in his earlier filings (and continues to experience), *"Every rebroadcast reopens trauma and exposes me to ridicule and harassment."* This is not hyperbole - it is the lived reality for someone whose embarrassing moments (some orchestrated or exaggerated by producers) are being replayed endlessly to new viewers. The law has long held that **privacy injuries are irreparable** because once a person's image or name is out in the public in an unauthorized manner, it cannot be clawed back. **Injunctive relief is the only way to prevent the continuing violation.** This is precisely why § 51 allows one to "prevent and restrain" the use - to stop the harm before it multiplies. If the Court denies relief, Defendants will presumably continue streaming and promoting Season 3 throughout the litigation, which could last months or longer, thereby compounding Plaintiff's harm and perhaps effectively defeating the ultimate relief (since by the time of judgment, the damage to Plaintiff's reputation could be done).

It is also worth noting that the **ten-year gap** that concerned the Court before, while still a factor, has a different significance now. Plaintiff acknowledges he did not seek an injunction in 2015. But circumstances in 2025 - especially the advent of global streaming - have **resurrected and amplified the harm**, essentially making it fresh. What was once sporadic reruns on cable has transformed into on-demand, high-profile availability on a major streaming platform (Peacock) with targeted marketing. The harm is thus not a stale, long-ago injury; it is immediate and happening as we speak. Plaintiff has acted promptly in 2025 to address this, filing suit and a TRO as soon as he was legally able (after exhausting EEOC processes, etc.). Delay is no longer an obstacle to finding irreparable harm because the **injury is current** and ongoing. Indeed, each new day of unconsented streaming is a new violation (a new "publication" under the law) - effectively restarting the irreparable harm clock continuously.

For these reasons, Plaintiff has demonstrated irreparable harm. No adequate remedy at law exists to stop the humiliation, loss of professional standing, and violation of his statutory rights except an injunction.

### III. Balance of Equities Tips in Plaintiff's Favor

The balance of equities (or hardships) strongly favors Plaintiff. On Plaintiff's side of the scale, we have the continuation of the serious harms just described – violation of personal rights, psychological trauma, and professional injury. On the Defendants' side, what hardship would a narrowly-focused injunction impose? At most, a temporary pause in one revenue stream (Season 3) or a need to adjust marketing materials to exclude Plaintiff's likeness, pending trial. This is a **minor burden** for a media conglomerate like NBCUniversal, especially given that *Below Deck* is a long-running franchise with numerous other seasons and spin-offs that are **not** subject to this motion. Defendants remain free to distribute and monetize all *other* content in the franchise (Seasons 1, 2, 4, etc., as well as *Below Deck Mediterranean*, *Below Deck Down Under*, etc.), which do not feature Plaintiff. The injunction would **only affect Season 3**, and even then, only its commercial availability (Defendants could still **talk about** Season 3 in news or commentary; they simply couldn't continue profiting from selling access to it).

From a business perspective, the revenue from past seasons on streaming is relatively marginal for Defendants, especially weighed against the human impact on Plaintiff. Any **financial loss** to Defendants from a pause on Season 3 can be calculated and, if it later turns out the injunction was improvidently granted, Defendants could theoretically claim damages via the injunction bond (Plaintiff is prepared to discuss security as appropriate). In contrast, the losses and harm to Plaintiff if no injunction issues are intangible and irreparable, as established. Equity favors preventing irreversible personal harm over preserving a revocable stream of dollars.

Additionally, Defendants cannot claim surprise or prejudice by an injunction: Plaintiff alerted them long ago (in 2024) that he objected to the use of his footage, and he has been seeking this relief since the start of the case. They have had notice and could have mitigated their "harm" by voluntarily restricting Season 3 distribution pending the outcome, but they chose not to. Therefore, any economic inconvenience they now face is **self-inflicted to an extent**. By contrast, Plaintiff has no power to avoid harm except through this Court's intervention.

In balancing equities, courts also consider the **status quo**. Here, Plaintiff seeks to restore the status quo **ante** as it existed before Season 3's recent resurgence online. The equities favor **preventing further change** in Plaintiff's condition (i.e., preventing further damage) rather than allowing Defendants to continue their new push of the content. The narrow injunction would effectively freeze the situation: Season 3 would be taken down from active circulation (status quo from Plaintiff's perspective = no new harm), and Defendants would wait until trial to resume any use (status quo from Defendants' perspective = they still have all their other content and can resume this one later if they win). This is equitable.

In sum, the hardship to Plaintiff without an injunction far outweighs any hardship to Defendants with an injunction. Equity tilts decidedly in favor of granting relief.

## IV. The Public Interest Is Served by a Narrow Injunction

Finally, the requested injunction would *not* disserve the public interest; on the contrary, it would advance important public interests while narrowly circumscribing any impact on expression. The public has multiple relevant interests here:

- **Enforcement of Privacy/Publicity Rights:** The public has an interest in seeing that statutes duly enacted to protect individual rights - like New York's privacy law - are enforced. Granting the injunction would signal that contracts and media companies must respect individual consent and cannot simply ignore a person's legal rights for profit. This upholds the rule of law and deters exploitative behavior in the entertainment industry. Particularly at a time when public awareness of performers' and reality TV participants' rights is growing, enforcing § 51 serves a broader public good of encouraging ethical treatment of individuals in media productions.

- **Truthful Content and Non-Misleading Use:** The public interest is also furthered by preventing misleading or false content from being disseminated under the guise of reality. If Plaintiff's portrayal was distorted (as he alleges), then halting its distribution

pending a trial promotes the public interest in not perpetuating false impressions. As the *Spahn* court observed, the public is not served by knowingly fictitious depictions of a person's life. Stopping the stream of such content until its truth can be tested aligns with the interest in accurate information.

- **First Amendment Considerations:** Importantly, the requested relief is crafted to **minimize any impact on public expression**. This is not a case of silencing commentary or suppressing news. If a journalist wants to write about *Below Deck* or about Plaintiff's allegations, they remain free to do so. If members of the public want to discuss or criticize Plaintiff (even unfairly) based on past viewings, the injunction cannot and does not purport to stop them. What the injunction does is temporarily remove from commercial availability the actual Season 3 footage - *i.e.*, the product that belongs to Defendants which uses Plaintiff's likeness. The public's First Amendment **right to receive information** is not significantly harmed: Season 3 is not a matter of urgent public concern or political speech; it is entertainment. Under *Zacchini*, the public's interest in viewing the precise performance must be balanced with the individual's right to economic benefit from that performance. Here, the public can still satisfy any curiosity through myriad articles, recaps, or discussions of Season 3 (which remain online), or simply wait until the matter is resolved. At most, the public interest in immediate access to a six-year-old reality TV season is minimal, and certainly outweighed by the aforementioned interests in enforcing the law and protecting individuals.

- **Narrow Tailoring to Serve Public Interest:** The injunction is narrowly tailored to serve Plaintiff's interests while respecting the public's. It does not seek to pull down any commentary, does not gag Defendants from speaking about Plaintiff or the show, and does not affect other creative works. It specifically targets **commercial transactions** in Plaintiff's likeness (streaming, sales, promotion of Season 3). The U.S. Supreme Court has noted that recognizing a person's right of publicity incentivizes creativity and effort by ensuring they can reap the reward of their performance. That is a public interest too it encourages people to participate in creative endeavors, knowing their rights won't be trampled. By granting relief, the Court would be affirming that interest.

On balance, the public interest prong favors issuance of the injunction. There is no strong public policy on the other side that would be hindered by temporarily stopping Season 3's distribution. In fact, the **public interest in fair treatment and legal accountability** would be furthered.

## V. Differences from Prior Motion and Why Relief Is Justified Now

To summarize, this renewed motion is distinguishable from Plaintiff's earlier attempts in several critical ways:

- **New Evidence:** Unlike the previous motion, which the Court found lacked genuinely new facts, here Plaintiff has presented concrete new evidence from post-July 14, 2025 events (ongoing streaming status, August 2025 promotions, etc.). This is not a re-packaging of

old arguments; it is fresh, material information changing the posture of the case.

- **Narrowed Relief:** Plaintiff has heeded the Court's First Amendment concerns and dramatically narrowed his requested injunction. The relief is limited to Season 3's commercial use. This avoids the "prior restraint" breadth that troubled the Court. It also aligns with how courts traditionally approach § 51 – by enjoining the specific offending use (for example, halting further sales of a bookcase-law.vlex.com or broadcasts of a performancesupreme.justia.com). Plaintiff is *not* asking the Court to bar Defendants from speaking or creating new content; only to stop distributing a product that unlawfully contains his likeness.

- **Controlling Law Cited:** The prior motion did not cite *Spahn*, *Zacchini*, or even § 51's text in depth. This motion corrects that. The Court's August 6 order noted Plaintiff failed to point to controlling authoritylaw.justia.com – now he has. The Court can consider those authorities and see that granting an injunction here would be consistent with precedent, not an outlier.

- **Statutory Grounds Emphasized:** Previously, Plaintiff's bid for an injunction might have seemed grounded in more nebulous claims (Title VII or general tort theories). Now, the injunction is firmly tethered to a clear statutory right (NY § 51). This gives the Court a solid legal hook on which to hang injunctive relief, and it clarifies that federal law (aside from the First Amendment) does not prohibit such relief. In fact, federalism principles allow this Court to enforce the state statute in federal court, and *Zacchini* confirms no federal constitutional bar exists to doing so.

In light of all the above, Plaintiff respectfully submits that the standards for both reconsideration and for issuance of a TRO/preliminary injunction are met. The Court **"overlooked"** neither facts nor law intentionally, but those facts and law are now squarely presented and merit a different outcome to prevent manifest injustice.Plaintiff has shown a clear likelihood of success on his privacy claim, irreparable harm, a balance of equities in his favor, and consistency with the public interest.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court **grant the Rule 59(e) motion**, alter or amend its prior order as appropriate, and **issue a Temporary Restraining Order and Preliminary Injunction** narrowly directed as follows:

**Proposed Injunctive Relief:** Enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert with them, **from any further commercial distribution, publication, or promotion of any audio-visual content from Season 3 of *Below Deck* in which Plaintiff appears**, including but not limited to streaming on Peacock, Bravo, YouTubeTV or any platform, sale of episodes or clips, and use of Plaintiff's name or likeness in marketing

materials for *Below Deck* Season 3, **until resolution of this case or further order of the Court**. Defendants shall take down or cause to be taken down any such content currently available on platforms within their control, and shall instruct third-party licensees (to the extent of Defendants' contractual power) to pause distribution of Season 3, pending trial. **This order would not apply** to non-commercial, news, or commentary uses of the content, nor restrict Defendants from distributing other seasons or discussing this litigation.

Such an order, in effect, preserves Plaintiff's statutory rights without unnecessarily impinging on free expression or Defendants' overall business. Plaintiff also requests that the Court accept the attached exhibits and declarations as part of the record, and schedule any hearing if needed to address this motion.

Plaintiff thanks the Court for its consideration and respectfully urges that the relief sought be granted in the interests of justice.

**Dated:** August 20, 2025.

Respectfully submitted,

**Emile Kotze,**

 **Pro Se** Plaintiff